## CORMAN AIRCRAFT CORPORATION v. WEIHMILLER.

### No. 5364.

Circuit Court of Appeals, Seventh Circuit.
July 3, 1935.

Raymond S. Pruitt, John J. Grealis, and Hamilton O. Hale, all of Chicago, Ill., for appellant.

Edwin Hedrick and Thomas B. Cooke, both of Chicago, Ill., for appellee.

Before SPARKS, FITZHENRY, and ALSCHULER, Circuit Judges.

FITZHENRY, Circuit Judge.

This is a suit to recover damages for the alleged breach of a written contract of employment by the wrongful discharge of appellee. A verdict was directed in favor of appellee in the sum of $5,501.20, with interest. From the judgment entered upon the directed verdict, appellant brought this appeal alleging that the trial court erred in taking from the jury the question of whether or not appellee was discharged for sufficient legal cause.

At the time of the making of the contract which forms the basis of the present suit, appellee was engaged in doing consulting work for commercial companies in the airplane industry. Although a young man, he had a splendid technical education, several years of practical experience in designing and constructing airplanes, had made a good reputation for himself in his profession, and his services were in demand. His work in designing planes for other companies brought him to the attention of Mr. Manning, an officer of the Cord Corporation, who, in July, 1928, asked him to design a certain type of trimotor airplane. Appellee submitted designs which met with the approval of Manning and a corporation was formed by him to manufacture and sell these planes. A contract was entered into on July 17, 1929, between the newly formed corporation, Corman Aircraft Corporation, and appellee, by which appellee agreed to give up his work as consulting engineer and devote all his time to the business and affairs of the corporation as its chief engineer and in any other office to which he might be elected by the board of directors. He also agreed to transfer to the corporation all his right, title, and interest in certain plans, specifications, and designs for the construction of Airliner, Beeliner, Ceeliner, Sealiner, Skyliner, and Skiliner airplanes and the registered trade-marks therefor and his right, title, and interest in and to any other plans, specifications, improvements, developments, or designs for airplanes or aviation engines or any accessories, equipment, parts, or attachments used or designed for use in airplane or allied products, or any tools, jigs, dies, or machinery used or designed for use in aviation or any allied industry. The contract provided that the corporation was to enjoy the exclusive use of all improvements in airplanes, or the equipment used in connection with their manufacture, that appellee might invent or discover during the term of his employment.

For this employment, appellee was to receive a salary to be determined by the Board of Directors from time to time but at a rate of not less than $541.67 monthly, and a bonus at the end of the year of 5 per cent. of the net profit derived from the manufacturing operations. In addition, the contract provided that the corporation should immediately issue in appellee's name 40,000 shares of its class "B" common stock.

The sixth paragraph of the contract reads as follows: "It is further understood and agreed that in the event of the disability of the Employee, except for temporary illness, to perform the duties required of him hereunder, the Employer, through its Board of Directors, acting in good faith and without fraud, passion or caprice, may terminate this agreement."

Before the corporation was formed and this formal contract entered into, appellee had actually been working for the promoters of the corporation for over a year under other agreements. He had already

procured an office, hired assistants, drawn plans and specifications, and commenced work on the airplanes. One plane had been built and tested. After observing the work of appellee for this considerable period of time, the formal contract of employment was made.

Appellee continued in the employment of the corporation, hiring assistants, buying materials, supervising construction, etc. He was elected president of the corporation and general manager.

The construction of plane No. 2 was completed, and it was flown. During all this time no objection was made by the corporation or its board of directors to the work which was done by appellee or the manner in which it was done. Their only expressions in regard to the work were those of approval. Witnesses for appellee testified to numerous statements by Manning of enthusiastic approval of the planes appellee had built, and, upon the trial of the case, Mr. Manning did not see fit to take the stand and deny that he had made these statements. Neither did appellant's witness Kelly, who was present when some of the statements were made, see fit to deny them when giving his testimony. Then, on October 19, 1929, appellee was summarily discharged.

The circumstances surrounding the discharge of appellee are best set forth in his own words:

"About four weeks before October 8th, I saw Mr. Manning and we talked over the general management of the plant and the plane, the progress of the company, and before he was leaving we talked about my going on my honeymoon. I told Mr. Manning the date had been set for October 11th and that we were going away; that I would be back just as soon as I possibly could, and that I wouldn't take two weeks; and that I would probably be back in ten days. He said it was all right, to go away and have a good time, to forget that I ever saw an airplane and come back to the plane prepared to give them 'hell'. He said, 'You have my blessing.'

"* * * I returned from my honeymoon on Saturday night of the following week. I was married October 11, 1929, the day of the big break in the stock market. I think the following Friday was called 'Black Friday,' but the first break came on that date. I had been gone ten days, and when I returned I went out to the plant with my wife on Monday morning.

"I walked in with my wife, looked around and the office looked quite different. They had torn down the partitions and made the office into one room. I had known nothing about changing the office before I left. I greeted the people in the office and said I was glad to be back, and introduced my wife. The partitions that formed the offices in the front room had been torn down and taken away; the desk, files and all the equipment had been rearranged. My desk was not there.

"I talked to Mr. Rivers and to Mr. Saxon. That is Mr. Rivers setting (sitting) there. He was in the employ of the Company as Vice President, next in charge to myself. I asked Mr. Rivers what was going on around there, and he said 'Mr. Manning had come down last week and ripped the place wide open. He told me he had fired nearly everybody there, and that I was fired. Mr. Rivers did not know why and said Mr. Manning did not give any reason. * * *"

On the same day appellee received the following letter from Mr. Manning, chairman of the board of directors of the Corman Aircraft Corporation: "This is to advise you that by action of the Board of Directors of the Corman Aircraft Corporation, you have been removed from the presidency of that company, your contracts cancelled, and your connection with the company terminated as of this date. Your salary has been paid in full to date."

Witness Bennett, who was discharged at the same time, testified: "Practically all of us were discharged, I think. At the moment when the discharge took place there were probably twelve or fifteen engineers and draftsmen in the room surrounding Mr. Manning. Mr. Manning said at the time that they had purchased or arranged, or in some way had acquired the Stinson Aircraft Corporation which was located at Wayne, Michigan, and they intended to close up that Dayton affair, that Dayton company, at that time and move the whole shop to Wayne, Michigan, the Stinson Aircraft plant."

In directing the jury to return a verdict for appellee, the court said:

"The Court has construed this contract, as it is the duty of the Court to do, and the Court construed the contract to mean that the parties themselves in this written agreement have agreed that the sole ground of discharge would be the disability of the plaintiff to perform his duties under the

contract, and that disability refers to a physical or mental disability to perform those duties.

"The Court further states that there is no evidence in this case of any physical or mental disability on the part of the plaintiff to discharge his duties under the contract."

Appellant challenges the correctness of this charge for the reason that there are implied covenants in every contract of employment that the employee will be obedient to his employer, loyal, and reasonably competent to perform the services for which he is engaged; that upon a breach of any of these implied covenants the employer may discharge the employee at any time regardless of the period for which the employee is hired; that justification for such discharge raises a question of fact for the jury. Appellee contends, on the contrary, that while it may be true that there is generally an implied covenant of competence, etc., in every contract of employment, the circumstances under which the contract was made may negative such an implication, and where the parties have stipulated in the contract that it may be terminated for certain definite causes, the right to terminate it for other causes is excluded.

As we view the sixth paragraph, it undertakes only to clarify the contract respecting a contingency which often involves embarrassment in agreements for employment, viz., the degree or extent of the employee's disability which will justify the employer in terminating the contract. It seems to us that this is the full scope of the paragraph, and that it does not purport to cover or affect any other cause for termination which might exist or develop. It would be quite illogical to conclude that, because the parties attempted thus to make clear the extent of the employee's disability which would justify the employer's termination of the contract, they thereby eliminated all other possible grounds for termination, such as incompetency, disloyalty, neglect, absenteeism, and the like, as to one or more of which the record discloses some evidence in support.

The best discussion which we have found in the reports of the question raised upon this appeal is in the case cited by appellant, Rorick et al. v. Gilbert (1931) 45 Ohio App. 96, 186 N. E. 756. On appeal to the Supreme Court of Ohio, this case was affirmed on other grounds, and the conclusion which we reach from our study of the Per Curiam opinion of the Supreme Court of Ohio is that they did not agree with the conclusion of the appellate court so far as it pertained to the question here before us. Gilbert v. Rorick, 125 Ohio St. 636, 186 N. E. 90.

Other reported cases bearing upon the question here involved are Franklin v. T. H. Lilly Lumber Co., 66 W. Va. 164, 66 S. E. 225; Brandt v. Godwin (City Ct.) 3 N. Y. S. 807; Kiker v. Bank Sav. Life Ins. Co., 37 N. M. 346, 23 P.(2d) 366; and Newcomb v. Imperial Life Ins. Co. (C. C.) 51 F. 725, 727, 728.

From our study of these and other authorities, we conclude that an employer is not precluded from discharging an employee, where legal cause is shown, though the contract designates certain specific causes justifying discharge.

The question whether sufficient cause was shown in the instant case as well as the question whether such cause, if it existed, was condoned by the employer and might not thereafter be set up as a reason for breaking the contract of employment, should have been submitted to the jury.

Reversed and remanded, with instructions to grant a new trial.