**TWENTIETH CENTURY–FOX FILM CORPORATION, Appellant,**

v.

**Ring LARDNER, Jr., Appellee.
No. 13491.**

United States Court of Appeals
Ninth Circuit.

Nov. 9, 1954.

Herman F. Selvin, Irving M. Walker, Wright & Garrett, Los Angeles, Cal., for appellant.

Kenny & Cohn, Charles J. Katz, Los Angeles, Cal., for appellee.

Before STEPHENS and CHAMBERS, Circuit Judges, and CLARK, District Judge.

CHAMBERS, Circuit Judge.

Ring Lardner, Jr., plaintiff and appellee, in the year 1947 was working under written contract as a screen writer for Twentieth Century-Fox Film Corporation. The latter, defendant and appellant, will hereinafter be referred to as "Fox."

Lardner was discharged on November 28, 1947, by Fox. Lardner filed suit and obtained judgment for approximately $25,000 in salary accruing after his discharge. This is a diversity case and Fox has appealed.

The events leading up to the discharge of Lardner start in 1947 with an investigation and hearings of the Un-American Activities Committee of the United States House of Representatives investigating alleged Communist infiltration of the motion picture industry. In advance, House investigators had been to Hollywood, but the actual hearings were in Washington. Those hearings with which we are concerned were held in October, 1947.

Lardner was one of ten witnesses from the motion picture employees who declined to tell the committee whether they were members of the Communist party. The refusal was oblique. The answers were not responsive to the questions and essentially consisted of questioning the authority of the congressional committee. The refusal of Lardner was made on October 30. On November 24, the "ten men," including Lardner, were cited by the House of Representatives for contempt. Prosecution in the district court in Washington, D. C., followed, Lardner being there convicted on June 22, 1950. Meanwhile, Lardner had been discharged by Fox on November 28, 1947, four days after the citation for contempt. The Fox board of directors on November 20 had adopted a resolution providing that any employee cited for contempt of Congress for failing to answer whether or not he was a member of the Communist party should be discharged.

Another of the "ten men" was Lester Cole. He was discharged by Loew's, Incorporated, for the same reason. He sued upon his contract, and his civil action was tried before his conviction in the criminal case in Washington. Lardner's civil case was tried below after he was convicted, after he had served his sentence and after this court's decision on appeal of Cole's case, Loew's, Incorporated v. Cole, 9 Cir., 185 F.2d 641. The 1947 congressional hearing on the motion picture industry is at the root of Cole's case and Lardner's. The conduct of the two before the committee is similar in all aspects important to this case. The events of the hearing are well described by Judge Pope in Cole's decision. For brevity, reference is made to the report of Cole's case. Throughout, reference and comparison will be made to the Cole litigation, and the facts herein stated may not be adequate without a reading of Cole's case.

Both Loew's and Fox justified the discharge of Cole and Lardner respectively

under the so-called "morals" or "good conduct" clause of the contract. Inasmuch as the Cole decision seemed to have been, and properly so, the chart for the trial of this cause, it may be well to set forth in parallel columns the good conduct clause of Cole's contract and the similar one in Lardner's contract. They are as follows:

### Cole's

"The employee agrees to conduct himself with due regard to public conventions and morals, and agrees that he will not do or commit any act or thing that will tend to degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer of the motion picture, theatrical or radio industry in general."

### Lardner's

"That the artist shall perform the services herein contracted for in the manner that shall be conducive to the best interests of the producer, and of the business in which the producer is engaged, and if the artist shall conduct himself, either while rendering such services to the producer, or in his private life in such a manner as to commit an offense involving moral turpitude under Federal, state or local laws or ordinances, or shall conduct himself in a manner that shall offend against decency, morality or shall cause him to be held in public ridicule, scorn or contempt, or that shall cause public scandal, then, and upon the happening of any of the events herein described, the producer may, at its option and upon one week's notice to the artist, terminate this contract and the employment thereby created."

---

One may observe that Lardner's contract said everything that Cole's said and a little more.

Fox justified the discharge on the ground that Lardner, by his conduct before the congressional committee, had breached the good conduct clause of the contract and therefore it, Fox, was excused from performance. Lardner replied that he had not breached the contract, but if he had breached it, then Fox, by continuing him on the payroll for almost a month and by giving him a new assignment, had waived the breach and was not justified in discharging him late in November.

While the defense was not expressly pleaded here, just as Cole did, Lardner forcefully claimed that the "ten men," he among them, were encouraged by their employers to defy Congress; that when a public clamor arose over the conduct of the screen writers, the producers then gave up the ten men as a burnt offering to appease public opinion. Both the appearances before Congress and the trial of Lardner's civil case were done with flair, if not flamboyance, by both producers and the screen writers.

Lardner won on the general issue at the trial for damages in the United States District Court for the Southern District of California. Also, the jury, on interrogatories, answered that Lardner had not breached the good conduct clause, but if he had, Fox had waived it.

By specifications of error, Fox raises a number of contentions. The most important ones are asserted as follows:

1. The trial court erred in permitting witnesses to testify on the issue of waiver as to conversations with certain

Fox executives without a requisite foundation of authority.

2. The trial court erred in not receiving in evidence discussions had at the meetings of the board of directors and the executive committee of Fox during the period from the time of Lardner's appearance before the congressional committee in October until his discharge in November.

3. The trial court erred in not admitting into evidence the record of Lardner's conviction of contempt of Congress for his refusal to testify on October 30, 1947.

4. The trial court erred in admitting into evidence the fact that after Lardner's discharge Fox, on all films publicly exhibited and upon which Lardner had worked, continued to give him credit for his part therein. (That is, the films continued to run after his discharge with credit given on the exhibition to Lardner. Or, stated another way, Fox did not rub Lardner's name off the completed films.)

5. The trial court erred in giving certain instructions and refusing others.

### Waiver

The Lardner contract called for two stints of ten weeks each, ten weeks being the usual minimum time for a screen writer's work on a scenario. At the time of Cole's discharge at Loew's, he was in the middle of a term of writing. The situation was different with Lardner. At the time of testifying in Washington, Lardner was finishing his work on his first picture (ten weeks) under his contract.

Lardner returned to Hollywood after the congressional hearings, and the production department of Fox went ahead with plans to use his services further. On November 26, a letter was given Lardner in behalf of Fox (signed by Lew Scheirber, who signed as executive manager). On that date Lardner endorsed his acceptance thereof.

By its terms, the letter referred to the basic contract and stated that Fox had not made up its mind whether it would produce another picture, "House by the River," but Lardner should go to work on it and he would be paid his regular weekly wage of $2,000. If Fox discontinued work thereon, the picture would not count as the second picture Lardner was to be assigned under the contract. This letter, together with Fox's delay of 29 days after Lardner testified before the committee in discharging him, was essentially the basis of Lardner's claim that Fox had lost any right which it otherwise may have had to discharge him.

While Fox is "the" producer, yet in its organization it has individual company producers who take charge of the production of assigned pictures. William Perlburg was one of these producers and it was with him that Lardner had worked on his picture under the subject contract. Lardner was permitted to testify as to a conversation he had with Perlburg in November, after Lardner's return from Washington. Perlburg was quoted as saying, after the hearings, that Darryl Zanuck, described by Lardner as West Coast manager, had commented unfavorably on the congressional proceedings and that Zanuck had said he was not interested in a man's politics but only in his ability in his particular job. Also, Lardner testified that Perlburg advised him that he wanted to use him on another upcoming project.

■ The words of Zanuck so introduced would have to come in as an admission, if at all. The record fails to show a proper foundation was laid showing authority in Zanuck to make contracts or to waive breaches of existing contracts. Zanuck may have an abundance of authority, but the court cannot take judicial notice thereof. If authority were shown in Zanuck, perhaps Perlburg could testify as to what Zanuck said, if material to any issue, but the objection is obvious to Lardner's testifying that "Perlburg said Zanuck said."

As to Perlburg's expressions of a desire to use Lardner further, again there appears to be a lack of foundation.

■ Under all the circumstances, the admission of "what Perlburg said" appears to have been highly prejudicial and so prejudicial that reversal is required.

#### Record of Conviction

■ Fox has complained that the record of Lardner's conviction for refusing to answer whether he was a member of the Communist party was not admitted in evidence. This court is of the opinion it should have been admitted. The civil jury was specifically permitted to consider from the evidence before it whether the crime had been committed, something already conclusively determined. Certainly the record of his conviction was the best evidence there was that the crime had been actually committed.

And if admitted in evidence, what materiality does it have? In Cole's case, supra, it was said that the clause that Cole "would conduct himself with due regard for public conventions" necessarily "includes an agreement to refrain from the commission of a misdemeanor of this character," i. e., contempt of Congress by refusing to answer whether one is a Communist. In Lardner's contract we have the proviso that Lardner shall not conduct himself "in a manner that shall offend against public decency, morality," etc. The words in Lardner's agreement, "decency and morality," surely carry as much implication to refrain from the particular crime here involved as does Cole's clause of "due regard for public conventions."

■ The law of this circuit having been established by Cole's case, and certiorari having been denied by the Supreme Court, 340 U.S. 954, 71 S.Ct. 570, 95 L.Ed. 688, it is appropriate that the implication of the same condition be made here. And upon receipt of the best evidence, conviction of the crime named in the implied clause, the issue of the breach of the contract is settled in favor of Fox.

The court is mindful of the California decision of Board of Education of City of Long Beach v. King, 82 Cal.App.2d 857, 187 P.2d 427. There the issue, on a teacher's discharge under the California tenure law, was whether the teacher had been guilty of *unprofessional conduct* in that he was alleged to have driven a motor vehicle on a highway while under the influence of intoxicating liquor. With a strong dissent, the majority held that the record of conviction of the offense could not be received in evidence. But if a contract provides by express language or by implication that an employee will not commit a certain crime, as held in the Cole case and here held applicable to Lardner, one believes, in the absence of statutory impediment, that California would hold that the best evidence and only the best evidence should be received.

■ Independent of the actual words of Lardner's contract, it occurs to this court that one ground justifying Lardner's discharge, for some reason, was not presented to the trial court. Hereinabove, the good conduct clause in the contract has been set forth. The fact that a contract of employment authorizes the employer to terminate it for certain specified causes does not ordinarily prevent the employer from discharging the employee for a legal cause not specified. Corman Aircraft Corporation v. Weihmiller, 7 Cir., 78 F.2d 241, 100 A.L.R. 504.

After making due allowance for the maxim of "expressio unius est exclusio alterius," one still cannot believe it was the intention of the parties to deny Fox rights to discharge which it had anyway under general law. The first consideration is to determine the intention of the parties. It would appear that the purpose of the good conduct clause was to give Fox something in addition to the general law.

■ It is implied in every contract of employment that the employee will conduct himself with such decency and propriety as not to injure the employer in his business. Restatement of Agency, § 380. In re Nagel, 2 Cir., 278 F. 105; Brown v. Dupuy, 7 Cir., 4 F.2d 367. And there being no dispute as to what

the ten men did, the question that should be resolved by the court objectively is whether the conduct of the screen writers, Lardner included, before the House committee, and whether getting themselves convicted of contempt of Congress in refusing to answer that they were or were not members of the Communist party, would tend to hurt their employers.

The screen writers never have had the publicity buildups as individuals that screen actors have had. There may have been a tendency for the ten men, all acting about alike before the committee, to be lost in anonymity as so many screen writers. Yet the conduct of and the ultimate conviction of Lardner in the circumstances of the case could not help but hurt Fox and everybody else in the motion picture business. It is true, as the record shows, that some people supported the ten men. But how could it be said that as a result of Lardner's conduct the employer sustained a net gain, or even held its own? Fox just necessarily suffered a net loss in public prestige.

 This being a California contract, California decisions would govern. The course that California would follow seems to be indicated by Adams v. Southern Pacific Co., 204 Cal. 63, 266 P. 541, 57 A.L.R. 1066. Lardner may or may not qualify as a "servant," but Section 3005 of the Labor Code of California [1] would seem to be in harmony with what has been said here. Certainly there was misconduct, and when the misconduct occurred during an investigation by the Congress of Lardner's service to Fox, it should be held that it was in the course of his service to Fox and not a matter separate from his service.

 Now returning to the words of Lardner's contract and approaching the case from the portion of the clause referring to "offense involving moral turpitude under federal * * * laws," it is to be observed that the trial court instructed the jury that the offense of refusing to answer questions before a committee of Congress did not involve moral turpitude. This instruction probably is rooted in the comment in Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 274, 73 L.Ed. 692, where Mr. Justice Butler, with respect to Harry F. Sinclair's conviction for contempt of Congress, said "No moral turpitude is involved." The statement should be read in the context of the opinion. Mr. Justice Butler was simply saying that the fact that Sinclair relied on competent legal advice in making his refusal to answer questions was no defense—that whether Sinclair willfully refused to answer proper questions of a properly constituted congressional committee was the essential question for Sinclair's jury. The case is authority for the proposition that moral turpitude is not an essential element of the crime. That is not to say that the circumstances of the commission of the crime may not be saturated with moral turpitude. It therefore would seem unnecessary to instruct the civil jury that Lardner's offense in Washington involved no moral turpitude.

With respect to crimes and moral turpitude, there are three possible classifications:

1. Those crimes necessarily involving moral turpitude, for example, frauds;

2. Those crimes which are so obviously petty that a record of conviction does not admit of a suggestion of moral

---

1. "3005. Discharge: Grounds. A master may discharge any servant other than an apprentice, whether or not engaged for a fixed term:

"(a) If the servant is guilty of misconduct in the course of his service, or of gross immorality even though such gross immorality is unconnected with his service.

"(b) If, being employed about the person of the master or in a confidential position, the master discovers that the servant has been guilty of misconduct, before or after the commencement of his service, of such a nature that, if the master had known or contemplated it, he would not have so employed the servant."

turpitude, for example, overtime parking;

3. Those crimes which may be saturated with moral turpitude, but nevertheless do not contain moral turpitude as a necessary element for conviction, for example, willful failure to pay federal income tax, and refusal to answer proper questions of a congressional committee. See In re Hallinan, 43 Cal.2d ——, 272 P.2d 768.

Parenthetically, it may be said that the word "offense" in Lardner's good conduct clause may be given a little broader meaning than "crime." It might justify dismissal for conduct for which no one bothered to prosecute the offender, or something that is no legal crime at all.

But be the foregoing as it may, the district court had before it the record of conviction. It had before it a complete transcript and pictorial record of the performance before Congress of the "ten men," including Lardner. It would appear that although the crime, per se, is one not historically infamous or one requiring as an essential element the proof of facts involving moral turpitude, yet the facts of the particular crime of Lardner in refusing under all circumstances to tell the committee whether he was a Communist should be held moral turpitude as a matter of law—not on the bare record of conviction but on the record of Lardner's actions before the congressional committee which had led to his conviction in the district court in Washington, D. C.[2]

## Instructions

With reference to the objections to the instructions, complaint is made that the instructions unduly limited the scope of the jury's inquiry to public reaction to Lardner's conduct. The objection is good, if the issue of breach were to be held properly submitted to the jury. The error was natural when the testimony was by sheer weight tremendous and,

on the issue of breach, almost entirely devoted to public reaction. But the clause that Lardner should not offend against decency and morality does not involve what the public's reaction in this case actually was. Instructions should have been given, if the case was to go to the jury on breach, concerning decency and morality, i. e., in addition to the instructions on public reaction. Probably the court would have had little trouble on this point if it had considered and given on "decency and morality" the instructions it would have given if the words "public ridicule, scorn or contempt or that shall cause public scandal" had not been in the good conduct clause.

On a retrial, the issue of waiver of defendant's breach will probably be before the jury and be the only question for consideration. Attention is invited to what is said about waiver in Cole's case, supra, by Judge Pope. What is said there is reaffirmed. In Lardner's case, the trial court instructed the jury concerning waiver as follows:[3]

"You are instructed that even if an employer has the right to discharge an employee under a contract, the employer may by his words or conduct waive that right. A waiver is such conduct of the employer as shows his election to forego the right to discharge which he might otherwise have taken or insisted upon under the contract. Once such right is waived by the employer, it is gone, so far as the particular conduct is concerned, and cannot be claimed by the employer except for some other or different violation of the employee.

"If an employer by his words and acts leads an employee to believe that certain conduct by the employee will not be considered a violation of his employment obligations, and the employee is reasonably justified so to believe, and the employee, in good

---

2. The record clearly shows the concert of action of the ten so-called unfriendly men.

3. The instruction is paraphrased to elimi-

nate references to a companion case tried at the same time, which case is not here on appeal.

faith, acts in such belief, then the employer may not thereafter be allowed to treat such conduct as a breach of the employee's obligations.

"An employee has a right to rely on statements of the authorized officers and representatives of a corporation by which he is employed in determining whether a certain course of conduct would violate his obligations as an employee.

"Twentieth Century-Fox had no duty to instruct or tell Lardner how he should or should not testify, or how he should or should not conduct himself before the House Committee on Un-American Activities.

"The belief by Lardner that his employer would not object to his conducting himself as he did before the House Committee on Un-American Activities, does not justify the finding that he was entitled to so conduct himself or that the employer approved such conduct in advance. It must also appear that the employee was reasonably justified in so believing.

"Waiver is the intentional giving up of a right which a party knows he possessed and concerning which he has knowledge of the material facts that have any bearing on such right. Therefore, a party cannot be found to have given up his right unless he does so after he has obtained full information of the material facts that relate to that right.

"If you find that Lardner breached his employment contract and, in consequence, that his employer had the right to discharge him, you must consider whether during the period that Lardner was continued to be employed his employer was in full possession of the material facts bearing upon its right to discharge. And unless you find by a preponderance of the evidence that the employer intentionally gave up its right after obtaining complete knowledge of the material facts having a bearing on that right, you cannot find that the right was waived by the employer in question.

"The fact that Twentieth Century-Fox knew immediately after Lardner had testified how he had conducted himself before the House Committee on Un-American Activities does not determine that the employer then had full and complete knowledge as to whether its employee's conduct had brought him into public scorn, contempt, or ridicule, or whether his conduct had shocked, offended, or insulted the community. Until the employer had full knowledge as to whether its employee's conduct had had such effect, it did not have complete knowledge of the material facts bearing upon its right to discharge.

"An employer knowing of an employee's conduct which might warrant his discharge may not, except as I shall instruct you, continue to employ the employee and at a later time treat the employee's conduct as a breach of his obligation. In determining whether or not the employer in the present case gave up its right to discharge its employee-plaintiff, Lardner, you should bear in mind that an employer may take a reasonable length of time to investigate and to consider the facts in order to come to a determination as to whether to discharge its employee, and a mere failure to discharge an employee during such a reasonable period of time while the employer is investigating and considering the conduct of its employee is not of itself a waiver of the right to discharge the employee. And if you find that the employer—Twentieth Century-Fox Film Corporation in the case of Lardner—did in fact keep its employee-plaintiff in its employ after a reasonable length of time had elapsed, as herein instructed, you should find that that employer had waived its right to discharge that employee-plaintiff.

"Even after all the facts bearing upon the employer's right to discharge had become known, the employer had a reasonable time within which to determine what it should do.

"In considering whether the conduct of the plaintiff had the effect on the public which his employer contends it had, you should not consider the effect which such conduct would have had if it had occurred today, but you should project yourself back to October and November of 1947 and consider the effect which that conduct had at the time it occurred and at the time of the discharge by the defendant employer."

 While the instruction is unduly limited to "public reaction" and omits consideration of a breach of decency and morality or an offense involving moral turpitude, it does appear to state correctly the California law on waiver of breach of condition or "election," as Williston calls it.[4]

### The Decision of Executive Committee and Board of Directors

 The minutes of the executive committee and the board of directors of Fox are not in the printed record. It would appear that in the end Fox did not pursue its offer of the minutes. It cannot complain of error.

As to these minutes, the trial court and the parties may have been guided by the remarks in Cole's case where it is said,

185 F.2d at page 656, "as respects the action taken, and the right to take it, such matters are as irrelevant as would be a transcript of the *debates* in its directors' meetings." (Emphasis added.)

 The statement is correct in context, but the minutes should be tested as to materiality, and insofar as they may reflect intent or conduct with reference to waiver they should be admitted. They should also be examined to ascertain whether they contain material within the well known exceptions to the hearsay rule.

### The Continued Use of Lardner's Name

 It is not essential that a notice of discharge give the correct reason for discharge, if a justifiable reason existed. The reason specified by Fox in its letter of discharge was that Lardner's conduct had brought Lardner into public ridicule, scorn or contempt. If Fox had to stand on that ground, the continued use of Lardner's name on the exhibition of films might tend in a way to show that Fox didn't believe that the conduct of Lardner had brought him into public scorn, or it might only show that Fox, not legally sure of itself, was afraid to take it off. However, on a retrial, in view of this court's ruling on the breach, the testimony of continued use of Lardner's name should not be admitted.

The case is reversed for further proceedings consistent with this opinion.

4. Also, the instruction should be rewritten keeping in mind that this court holds Fox had a right to discharge Lardner unless the right was waived. Further, there seems to be no evidence in the case justifying submitting to the jury the question of "advance waiver."