Adrian SCOTT, Appellant,

v.

RKO RADIO PICTURES, Inc., a corporation, Appellee.

No. 14985.

United States Court of Appeals Ninth Circuit.

Jan. 10, 1957.

Rehearing Denied Feb. 13, 1957.

Kenny & Cohn, Charles J. Katz, Robert W. Kenny, Los Angeles, Cal., for appellant.

Irving M. Walker, Herman F. Selvin, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for appellee.

Before ORR, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Plaintiff-appellant Scott, a screen director, was discharged by defendant-appellee RKO Radio Pictures, Inc., on November 26, 1947, after his participation as a witness in hearings before the Committee on Un-American Activities of the United States House of Representatives. At the time of the discharge, Scott was working with RKO under an unexpired written contract dated February 10, 1947.

This case is the third of three discharged witnesses of the motion picture industry to come on appeal to this court. The previous cases are Loew's, Inc. v. Cole, 9 Cir., 185 F.2d 641, and Twentieth Century-Fox Film Corp. v. Lardner, 9 Cir., 216 F.2d 844. The statement of this case will be abbreviated by reference to the two prior cases.

The complaint herein was filed January 21, 1948. Meanwhile, Scott had been indicted in the District of Columbia for refusal to answer the committee's questions. Of this crime he was convicted on June 22, 1950. Sentence of one year was imposed on September 27, 1950, and the term of service thereunder was completed about July 28, 1951.

RKO in its notice of discharge to Scott asserted he had breached the "morals clause" of his contract and hurt the company by his conduct at the hearings, the clause reading as follows:

"At all times commencing on the date hereof and continuing throughout the production or distribution of the pictures, the producer will con-

duct himself with due regard to the public conventions and morals and will not do anything which will tend to degrade him in society or bring him into public disrepute, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or public morals or decency or prejudice the corporation or the motion picture industry in general; and he will not wilfully do any act which will tend to lessen his capacity fully to comply with this agreement, or which will injure him physically or mentally."

Parenthetically, we now quote Cole's contract clause and Lardner's:

Cole's: "The employee agrees to conduct himself with due regard to public conventions and morals, and agrees that he will not do or commit any act or thing that will tend to degrade him in society or bring him into public hatred, contempt, scorn or ridicule, or that will tend to shock, insult or offend the community or ridicule public morals or decency, or prejudice the producer of the motion picture, theatrical or radio industry in general."

Lardner's: "That the artist shall perform the services herein contracted for in the manner that shall be conducive to the best interests of the producer, and of the business in which the producer is engaged, and if the artist shall conduct himself, either while rendering such services to the producer, or in his private life in such a manner as to commit an offense involving moral turpitude under Federal, state or local laws or ordinances, or shall conduct himself in a manner that shall offend against decency, morality or shall cause him to be held in public ridicule, scorn or contempt, or that shall cause public scandal, then, and upon the happening of any of the events herein described, the producer may, at its option and upon one week's notice to the artist, terminate

this contract and the employment thereby created."

In Lardner's case we held as a matter of law that there was a breach by Lardner of the express conditions and the implied conditions of Lardner's contract.

In Scott's case the jury on February 15, 1952, found in his favor on special interrogatories and with a general verdict. The trial judge granted a new trial upon the ground that the jury's verdict was against the weight of the evidence. Later Scott's case was submitted to the same trial judge for decision on the same evidence which the jury had seen and heard. The judge then entered findings and a judgment on September 29, 1955, in favor of the defendant, holding the contract breached by Scott, the breach not waived, and the discharge justified.

The findings and conclusions were as follows:

"Findings of Fact and Conclusions of Law

"This cause came on regularly to be heard on August 26, 1955, before the Honorable Ben Harrison, District Judge, sitting without a jury, the parties having expressly waived a jury. Plaintiff appeared by his attorneys Robert W. Kenny, Esq., Charles J. Katz, Esq., and Morris E. Cohn, Esq. Defendant appeared by its attorneys Irving M. Walker, Esq., Herman F. Selvin, Esq., Robert A. Schlesinger, Esq., and Harry J. Keaton, Esq. Evidence on behalf of both parties was received and the cause submitted to the Court for decision. The Court having duly considered the matter, makes its findings of fact and conclusions of law as follows:

"Findings of Fact

"I.

"At all times material herein, plaintiff was and is a citizen of the state of California; and defendant was and is a corporation duly organized and existing under and by virtue of the laws of the state of

Delaware, and a citizen of that state. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

## "II.

"At all times material herein, plaintiff was by profession a motion picture producer and director and had long experience working in such capacities in the motion picture industry; and defendant was and is engaged in the business of producing motion pictures, which motion pictures were and are distributed and publicly exhibited throughout the United States and most of the other countries of the world.

## "III.

"On or about February 10, 1947, plaintiff and defendant entered into a contract under and by virtue of the terms of which defendant employed plaintiff to render his services as a producer or director of motion pictures, or both, for a term of 104 weeks commencing February 10, 1947, for which services defendant agreed to pay plaintiff the sum of $1400 per week.

## "IV.

"Under and by virtue of said contract plaintiff agreed, among other things, that he would conduct himself with due regard to public conventions and morals and would not do anything which would tend to degrade him in society or bring him into public disrepute, contempt, scorn or ridicule, or that would tend to shock, insult or offend the community or public morals or decency or prejudice the defendant or the motion picture industry in general. Said contract was also subject to and bound plaintiff by an implied covenant on his part not to do anything which would prejudice or injure his employer.

## "V.

"Plaintiff well and truly performed all producing and directing services required of him until on or about November 26, 1947; and defendant well and truly performed each and every obligation on its part to be performed until on or about said date.

## "VI

"During the year 1947, the Committee on Un-American Activities of the House of Representatives of the Congress of the United States (hereinafter referred to as the "Committee"), held both closed and public hearing regarding communist infiltration of the motion picture industry. A public hearing in that regard was held by the Committee in Washington, D. C., on October 20 to 30, 1947. The intention to hold such hearings, the hearings themselves, the testimony given and statements made thereat, and the conduct and activities of the various witnesses who appeared before the Committee were all matters which, at the time they occurred and for a considerable period of time afterwards, were widely, fully and extensively reported, publicized, discussed and commented upon in and by the various media of public information, including newspapers, radio and newsreels, throughout the United States and other countries of the world in which American motion pictures, including those of defendant, were and are distributed and publicly exhibited. The subject and conduct of said hearings, and particularly the public hearing held in October, and the testimony and conduct of the witnesses who appeared at that hearing were matters which aroused and sustained great public interest, concern, discussion and comment throughout the United States and elsewhere.

## "VII.

"The expressed attitude of the motion picture industry, including defendant, toward the hearings was that communists had not infiltrated the industry and that no communist

propaganda had gotten into its pictures; that committee procedures should be changed and improved so as better to protect the rights of persons appearing, but that the industry would cooperate with the committee to bring out the full facts: This attitude was publicly expressed by industry representatives before and during the hearings, and was widely publicized.

### "VIII.

"Plaintiff and a number of other persons identified with and prominent in the motion picture industry were subpoenaed to appear and testify before the Committee at the public hearing held in October, 1947, as aforesaid. Nineteen of said persons, including plaintiff, combined and agreed together as to the manner in which they would conduct themselves before the Committee and the testimony which they would and would not give at said hearing. Eleven of said persons, including plaintiff, were called to the stand and examined by the Committee. Each of said persons, including plaintiff, was asked by the Committee whether he was or ever had been a member of the Communist Party and each of them (except for one man who was only temporarily visiting in this country), including plaintiff, refused to answer that question or state whether he was or ever had been a member of the Communist Party.

### "IX.

"The proceedings in connection with the appearance of plaintiff and the other persons who had refused to answer the questions of the Committee were reported to the House of Representatives by the Committee; and on November 24, 1947, the House, by resolution duly adopted, certified said report to the United States Attorney for the District of Columbia to the end that plaintiff and said other persons might be proceeded against in the manner and form provided by law. The report of the Committee and the resolution of the House were widely reported and publicized in and by all media of public information throughout the United States and elsewhere.

### "X.

"On December 5, 1947, plaintiff and the other persons referred to in Finding IX, were indicted and thereafter on the trials of said indictments were convicted, in the United States District Court for the District of Columbia, of the crime defined in section 192 of Title 2 of the United States Code Annotated. Said indictments and convictions were based on the refusal of said persons, including plaintiff, to answer pertinent questions put to them by the Committee, including the question referred to in Finding VIII.

### "XI.

"In pursuance to the case of [Twentieth] Century-Fox [Corp.] v. Lardner, [9 Cir.,] 216 F.[2d] 844, the Court finds that:

"The conduct of plaintiff, individually and in concert and agreement with others, at and in connection with said hearings of the Committee, as hereinabove more particularly found, was had without due regard on the part of plaintiff, and was contrary, to public conventions and morals; said conduct tended to and did bring plaintiff into public disrepute, contempt, scorn and ridicule; said conduct tended to and did shock, insult and offend the community and public morals and decency; and said conduct tended to and did prejudice defendant and the motion picture industry in general. Said conduct also tended to and did cause a large part of the public to believe that plaintiff and those with whom he acted in concert were in fact communists; that communists had infiltrated the

motion picture industry; and that the attitude of the motion picture industry, as hereinabove in Finding VII found was not held in good faith and was not in fact the attitude of the industry, but, rather, that the industry, including defendant, was shielding and harboring communists.

"XII.

"On or about November 26, 1947, defendant discharged plaintiff from its employ and terminated the contract referred to in Finding III. Said discharge was not wrongful, unlawful or without cause and was not made in bad faith; but was made in good faith upon and for good cause and was rightful, lawful and proper; and said contract was thereby rightfully, lawfully and effectively terminated.

"XIII.

"Defendant did not intend to waive and did not waive plaintiff's breach of contract referred to in Findings XI and XII. Defendant did not intend to condone or excuse and did not condone or excuse plaintiff's conduct referred to in Findings VIII and XI, and did not intend to waive or relinquish and did not waive or relinquish its right to discharge plaintiff on account of that conduct. Defendant exercised its right of discharge seasonably and within a reasonable time after the right arose. Defendant did not induce or lead plaintiff justifiably to believe that conduct of the sort in which he engaged would not affect or endanger his employment.

"XIV.

"Plaintiff has not been damaged in any amount whatever by reason of any act or omission of the defendant.

"Conclusions of Law

"In pursuance to the case of [Twentieth] Century-Fox [Corp.] v. Lardner, 216 F.2d 844, the Court finds:

"1.  The discharge of plaintiff by defendant was made justifiably and upon and for good cause.

"2.  The right to discharge was not waived or relinquished by defendant nor was the conduct which gave rise to that right condoned or excused.

"3.  Defendant is entitled to judgment that plaintiff take nothing of or from defendant and that the cause be dismissed on the merits, with defendant's costs incurred herein.

"Let Judgment be entered accordingly."

■ We are confident that the morals clause in Scott's contract was no weaker from management's position than Lardner's. If there be shades of the two, Scott's clause was the stronger or stricter. The implied condition of every California contract of employment was the same. See Lardner's case, supra.

At the hearings, the conduct of the witnesses was not distinguishable.

■ Here Scott makes a frontal attack on our decisions in the previous two cases, particularly Lardner's. It is done with some persuasiveness. However, we believe Lardner's case was correctly decided and further believe that it should stand as authority here. An opposite result in two companion cases so nearly alike would discredit the law.

The appellant attacks the insertion of the phrase in the findings and conclusions reading as follows: "In pursuance to the Twentieth Century-Fox Film Corp. v. Lardner, 216 F.2d 844, the court finds:"

The findings certainly are broader and more inclusive than our decision in Lardner's case. We are not sure of the trial court's meaning in the use of the words "In pursuance to." Probably they mean no more than "following." It can be argued the judge has gone beyond the Lardner case and made extensive independent findings. It could be said "In pusuance to" was a parenthetical reference to Lardner, or it could be argued he thought

he was compelled to go at least as far as Lardner's case, and said so.

In any event, the judgment should be and is affirmed.