**Paul H. BROCK, Appellant,**

v.

**MUTUAL REPORTS, INC., Appellee.**

**No. 13120.**

District of Columbia Court of Appeals.

Argued Nov. 9, 1978.

Decided Jan. 10, 1979.

John Perazich, Washington, D. C., for appellant.

Allen T. Eaton, Washington, D. C., with whom Jeanette Michael, was on brief, for appellee.

Before KERN, YEAGLEY and FER-REN, Associate Judges.

FERREN, Associate Judge:

This case presents a central question: whether appellee Mutual Reports, Inc. (Mutual) committed a breach of a one-year employment contract with appellant Paul H. Brock (Brock) when it removed him from his managerial responsibilities as vice president in charge of news operations for the Mutual Black Network and reassigned him, at the same salary, to a regular news shift.

After a non-jury trial, the court held that Brock had failed to prove that Mutual had committed a breach, and then denied Brock's claim for lost salary and other compensation. Brock accordingly appeals the trial court's judgment, asserting that Mutual's conduct amounted to a constructive discharge and that Mutual had insufficient cause to discharge him. Alternatively, Brock argues that even if Mutual's actions were justified, he is entitled to recover fees for his emergency on-the-air newscasts and, further, to obtain a share of the "reciprocal trade allowance" promised in the contract, prorated to the date of his discharge.

Although we conclude that Mutual did constructively discharge Brock, we further conclude that such discharge was justified. We therefore agree with the trial court's conclusion that Mutual's actions did not amount to a breach of the contract with Brock. We also conclude, however, that Brock had a right to a pro rata share of the reciprocal trade allowance (compensation in products rather than cash). We therefore must reverse the judgment insofar as it denies that claim and remand to the trial court for a determination of damages.

I.

On March 18, 1976, Brock entered into a written employment contract with Mutual for one year, April 1, 1976–March 31, 1977, as Vice President of News and Information. His duties were

to direct the News Operations of the Mutual Black Network News (Mutual Reports), including the responsibility for programming, directing, managing and such other duties consistent with the foregoing as may be determined by the President and the Board of Directors of Mutual Reports.

As a result, Brock received responsibility to oversee the day-to-day operation of the network, including determination of the content of the news reports and supervision of eight newscasters and three tape editors. For his services Brock was to receive a $30,000 annual salary, a $5,000 "reciprocal trade allowance" (later determined to be a 1977 Buick), a 1% "cash bonus" on cash receipts in excess of those in 1975, a company automobile, hospitalization benefits, and a four-week vacation.

On or about September 10, 1976, Mutual reassigned Brock to a regular news shift and relieved him of his responsibilities as news director. Mutual claimed it had become clear that Brock was incapable of serving in a managerial position. Although Mutual also advised Brock at the time that the change in duties would not affect his salary, he refused to accept the reassignment and, as a result, considered himself discharged on or about October 14, 1976. He then filed suit claiming lost salary totaling $13,750, as well as the $5,000 reciprocal trade allowance, the reasonable value of the use of an automobile (pursuant to the "company automobile" provision) for the balance of the contract period, unreimbursed expenses totaling $2,600, and any cash bonus to which he might be entitled. Brock also claimed $4,200 for on-the-air newscasts to be compensated pursuant to a union agreement.

On November 15, 1977, the trial court entered judgment for Mutual based upon oral findings and conclusions. Noting that Mutual had not reduced Brock's compensation when it changed his duties, the court found that the reassignment did not constitute a constructive discharge. In reaching its ultimate conclusion that Mutual had not committed a breach of contract, the court also considered the quality of Brock's services to the company and found that they had been unsatisfactory. In addition, the

court found that Brock's actions in charging an airplane ticket for a personal friend to the company account was a flagrant violation of his responsibilities, constituting a breach of the contract by Brock himself. Finally, the court concluded that appellant had not borne the burden of proving that he was entitled to his claimed business expenditures, compensation for emergency broadcasts, or damages representing an accrued portion of the reciprocal trade allowance.[1]

## II.

■ Brock argues, first, that his demotion to a regular news shift amounted to a constructive discharge. The law is well established: when an employee contracts to fill a particular position any material change in duties or significant reduction in rank will constitute a constructive discharge which, *if unjustified*, is a breach of contract. *Hayes v. Resource Control, Inc.*, 170 Conn. 102, 105, 365 A.2d 399, 400 (1976); *Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 10, 330 N.Y.S.2d 33, 40, 280 N.E.2d 867, 872 (1972); *see* 3A A. Corbin, Contracts § 683 (1960); Annot., 63 A.L.R.3d 539 (1975). The employee has the burden of demonstrating that the employer's actions constituted such a discharge. 63 A.L.R.3d, *supra* at 544. Brock has satisfied that burden.

The contract clearly stated that Mutual hired Brock in an executive capacity as Vice President of News and Information. Mutual gave him the responsibility for programming, directing, managing, and "other duties consistent with the foregoing." The evidence is undisputed that, in practice, Brock's duties included giving day-to-day guidance to eight newscasters and three tape editors, critiquing the staff, approving the content of news stories, and administering the work of the news office. His reassignment to a regular news shift stripped him of all his managerial functions and left him with no more responsibility than that of the eight newscasters he had previously supervised. Although his salary remained the same, his duties changed substantially. His new position was a significant demotion.

■ Other courts, dealing with similar situations, have recognized that such demotions constituted constructive discharges.[2] The fact that the employee receives the same salary is immaterial, *see Sigmon v. Goldstone*, 116 App.Div. 490, 493, 101 N.Y.S. 984, 986 (1906); 63 A.L.R.3d, *supra* at 544, because the status associated with the original position may well have been the primary inducement for making the contract. *Cooper v. Stronge & Warner Co.*, 111 Minn. 177, 179, 126 N.W. 541, 541 (1910); *Rudman v. Cowles Communications, Inc.*, *supra* 30 N.Y.2d at 11, 330 N.Y.S.2d at 41, 280 N.E.2d at 872; 3A A. Corbin, *supra* § 683. In light of these considerations and the uncontroverted evidence that Brock's duties and rank were materially changed by Mutual, we conclude that the trial court erred in determining that Brock's demotion did not constitute a constructive discharge.

## III.

■ This is not to say, however, that the discharge here was unjustified, amounting to a breach of contract. *See Cooper v. Stronge & Warner Co.*, *supra*, 111 Minn. at 179, 126 N.W. at 541–42. To the contrary, we conclude that Mutual had a justifiable basis for discharging Brock.

■ In every employment contract, the employee promises either expressly or by implication that he or she will perform the

---

1. The trial judge agreed to receive supplementary memoranda on Brock's alleged right to a pro rata share of the reciprocal trade allowance, but on November 25, 1977, he denied the request for such damages.

2. *See, e. g., Hayes, supra*, 170 Conn. at 106, 365 A.2d at 401 (reassigned vice president supervising four salesmen to the position of manager acting as salesman and supervising no one); *Cooper v. Stronge & Warner*, 111 Minn. 177, 178, 126 N.W. 541, 541 (1910) (reassigned manager of sales department to position as sales clerk); *Rudman, supra* 30 N.Y.2d at 11–12, 330 N.Y.S.2d at 40–42, 280 N.E.2d at 872–73 (reduced person hired in executive capacity to position in which he was supervised by virtually all other editors).

work in a diligent and reasonably skillful manner. *See* 3A A. Corbin, *supra* § 682; 9 S. Williston, *Contracts*, § 1012C (3d ed. 1967). An employer, therefore, may discharge an employee who fails to perform his or her duties accordingly. *See Davies v. Mansbach*, 338 S.W.2d 210, 212 (Ky.1960); *Brown v. Chris Nelsen & Sons, Inc.*, 10 Mich.App. 95, 99, 158 N.W.2d 818, 820 (1968); *Rudman v. Cowles Communications, Inc., supra* at 12, 330 N.Y.S.2d at 41, 280 N.E.2d at 873; *Wilson v. McClenny*, 262 N.C. 121, 131, 136 S.E.2d 569, 577 (1964); 9 S. Williston, *supra* § 1012C. This rule is based on the practical consideration that an employer cannot be expected to retain an employee who is inefficient and cannot competently perform the job for which he or she was hired. *See Georesearch, Inc. v. Morriss*, 193 F.Supp. 163, 178 (W.D.La. 1961), *aff'd per curiam*, 298 F.2d 442 (5th Cir. 1962); *Wilson v. McClenny, supra*, 262 N.C. at 131, 136 S.E.2d at 577. Slight or occasional omissions do not constitute incompetent conduct justifying dismissal; thus, the proper test for determining whether an employer can be held liable for terminating an employee's contract is whether the conduct is so inconsistent with the employer-employee relationship that it prejudices a valid business interest of the employer. *See La Fontaine v. Developers & Builders, Inc.*, 261 Iowa 1177, 1187–88, 156 N.W.2d 651, 658 (1968); *Brown v. Chris Nelsen & Son, Inc., supra*, 10 Mich.App. at 99, 158 N.W.2d at 820; *Dixie Glass Co. v. Pollak*, 341 S.W.2d 530, 543. (Tex.Civ.App. 1960) *aff'd*, 347 S.W.2d 596 (Tex.1961). This determination is ordinarily a question of fact, with the burden on the employer to justify the discharge. *Davies v. Mansbach,*

*supra* at 212; *see Lucas v. Whittaker Corp.*, 470 F.2d 326, 328 (10th Cir. 1972).

In the present case, Mutual introduced considerable evidence that Brock was not satisfactorily performing his job. On August 26, 1976, Mr. Yates, President of Mutual, sent Brock a memorandum advising him that his administrative work flow was "disastrous"; that reports, time sheets, and notification of personnel changes were "not done correctly, completely, and in time"; and that Brock had demonstrated little understanding of "cost control and operating budgets." Evidence of these failings was reiterated at trial. In addition, witnesses for Mutual testified that Brock ignored or took offense at the directions of his supervisors and was seldom on the premises to critique and give day-to-day directions to the staff. Mutual's principals had received numerous complaints about Brock from news personnel and concluded that a serious morale problem existed among those under Brock's control. In addition, there was evidence that Brock, without authority, had committed Mutual to a contract with the Black Audio Network.

■ It is arguable that none of these lapses, in isolation, was so inconsistent with the employer-employee relationship, or so detrimental to the valid business interest of the employer, as to constitute a sufficient basis for discharge. When considered together, however, they provide substantial support for the trial court's conclusion that Mutual did not commit a breach of contract. *See Davies v. Mansbach, supra* at 212; *Morris v. Rosenberg*, 64 Wash.2d 404, 409, 391 P.2d 975, 978 (1964); D.C.Code 1973, § 17–305(a).[3]

---

**3.** In reaching its conclusion that Mutual had not committed a breach of contract, the trial court found that Brock himself had committed a breach by charging a plane ticket for a personal friend to the company account. Brock asserts that this action could not have amounted to a material breach either alone or in combination with other factors. He notes that he did not hide this charge from the company (a secretary knew about it) and that he always had acknowledged his responsibility to reimburse Mutual (although he has not yet done so). Further, according to Brock, the company

owed him more than the amount of the plane ticket in unreimbursed expenses. Finally, Brock stresses that Mutual did not rely on this reason for demoting (and thereby discharging) him.

Because Brock's unsatisfactory performance provided Mutual with sufficient justification for the discharge, we need not decide whether Brock's personal use of corporate funds under these circumstances amounted to a material breach justifying discharge. We note, however, that if sufficient cause for a discharge exists, it is irrelevant that the employer failed

In summary, we hold the trial court was correct in concluding that Brock committed a breach of contract justifying his discharge. While Mutual had no right under the contract to reassign Brock, even at the same salary—and thus its actions technically amounted to a constructive discharge—such gratuitous actions provided no basis for a breach of contract suit. Under the circumstances, they merely served to permit Brock to leave Mutual's employ—which he did.

## IV.

■■■■■ Brock maintains, finally, that if we conclude he was properly discharged for cause, we should hold, nonetheless, that the trial court erred in denying his other claims for damages. In particular, Brock asserts that he is entitled to receive fees for his emergency on-the-air newscasts and to obtain a pro rata share of the reciprocal trade allowance he was promised in the contract.[4]

■■■ A. Brock introduced evidence that he had made approximately 100 on-the-air news broadcasts on an "emergency basis" during the term of his employment. He claims that as a member of the American Federation of Radio & Television Artists (AFTRA) he was entitled to a minimum fee of $42 for each broadcast. Noting that Brock had never objected to making the broadcasts or claimed additional compensation for them during the six and one-half months before his discharge, the trial court

found that Brock had recognized that the contract gave him responsibility to perform such emergency tasks. The court accordingly concluded that this claim had no basis.

The contract provided that Brock's duties were to include "programming, directing, managing and such other duties consistent with the foregoing as may be determined by the President and Board of Directors." Brock himself testified that in small broadcasting organizations such as Mutual Reports, the news director would normally be expected to perform newscasts in an emergency. In addition, Brock's employment contract provided that he was to join and remain a member of any union with which Mutual Reports had an agreement requiring membership. In accordance with this agreement, Brock joined AFTRA, which at the time was a bargaining unit consisting only of on-the-air personnel. It follows that although the contract did not permit Mutual to change Brock's duties to those of a full-time newscaster, the parties did intend that Brock perform some newscasts as part of his overall responsibility to keep the station functioning. We conclude that the trial court correctly denied the claimed fees.[5]

■■■ B. As to the second claim for damages, we note that paragraph 3(b) of the contract provided that in addition to Brock's $30,000 annual salary, Mutual would provide "reciprocal trade allowances," i. e., products rather than money,

---

at the time of discharge to mention this ground for termination of the contract. 3A A. Corbin, *supra* § 762 at 526. This is true whether the employer preferred to state some other reason or, instead, was unaware of this ground when he terminated the contract. *See Twentieth Century-Fox Film Corp. v. Lardner*, 216 F.2d 844, 854 (9th Cir. 1954), *cert. denied*, 348 U.S. 944, 75 S.Ct. 365, 99 L.Ed. 739 (1955); *Heyman v. Kline*, 344 F.Supp. 1088, 1101 (D.Conn.1970), *rev'd on other grounds*, 456 F.2d 123 (2d Cir.), *cert. denied*, 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972); 3A A. Corbin, *supra* § 762.

4. In his prayer for relief Brock also maintains that he is entitled to the fair market value of a rental car comparable to the one provided him under paragraph 5 of the contract until his dismissal, and to his unreimbursed reasonable business expenditures. Because Mutual did

not commit a breach of contract, Brock is not entitled to the reasonable value of a rental car for the period after he left the job. As to Brock's claimed business expenditures, we adopt the trial court's conclusion that Brock failed to demonstrate that these were legitimate business expenses. In his original complaint, Brock had also sought the cash bonus to which he had been entitled under the contract. He did not, however, request the trial court to rule on this issue and has not pursued the matter on appeal.

5. Because Brock received full compensation (other than the reciprocal trade allowance) while the contract was in effect, there can be no claim that he made the newscasts without compensation.

totaling $5,000 for the year. Evidence introduced at trial indicated that Brock's trade allowance was to be in the form of a 1977 Buick worth $5,000 once the 1977 models became available in the fall of 1976.[6] Brock, however, never received the car or any other product.[7] He now claims that the trial court erred as a matter of law in denying him a share of the reciprocal trade allowance pro rated to reflect his length of service with Mutual. We agree.

In the absence of an agreement to the contrary, the fact that an employee was discharged for cause does not operate to deprive him of compensation already earned. *See Jones v. District Parking Management Co.*, D.C.App., 268 A.2d 860, 862 (1970); *Winkler v. Frank-Cunningham Stores Corp.*, D.C.App., 256 A.2d 905, 907 (1969). In this case, the agreement specifically provided that Mutual was to pay the allowance "during the term of the contract." Brock's right to the car or some other product was not contingent; nor was it to be deferred until completion of the contract term. The only reason that Brock had not received the Buick by the date of his dismissal was that the 1977 model had not yet been marketed.

The trial court therefore erred in denying Brock's claim for a pro rata share of the allowance. The case, accordingly, must be remanded to the trial court for a determination of the exact length of Brock's employment with Mutual and the corresponding damages to which appellant is entitled.[8]

## V.

The judgment of the trial court is affirmed, except with respect to Brock's claim for a prorated share of the $5,000 reciprocal trade allowance. The case is remanded to the trial court for a determination of such damages.

*So ordered.*

YEAGLEY, Associate Judge, concurring:

I concur in the result and in the opinion except for Section II. In my view, our holding that Brock breached the contract is dispositive of this case. Once the contract was breached, Mutual could rightfully treat it as a nullity and discharge appellant. By the same token, it could choose the less drastic route of reassignment. I do not believe we need to reach the issue of whether the reassignment under the circumstances of this case amounted to a constructive discharge.

---

6. Mutual would receive the Buick, for example, in exchange for advertising Buicks; this is the reciprocity reflected in the trade allowance concept.

7. Pursuant to paragraph 5 of the contract Brock was entitled to a company car, which was not the same as the one intended under paragraph 3(b).

8. Brock claims that he is entitled to $2,700, or 54% of $5,000 based on 6½ months of service. If the parties agree that this calculation (or some other) represents the proper measure of damages, then they may submit their stipulation to the trial court for use as part of the final order. Absent agreement of the parties, however, we leave to the trial court the determination of the proper award of damages to Brock for Mutual's failure to pay such in-kind compensation.