**GORMAN PUBLISHING COMPANY,**
**Plaintiff,**

v.

**Thomas R. STILLMAN et al.,**
**Defendants.**

**No. 77 C 4204.**

United States District Court,
N. D. Illinois, E. D.

Oct. 21, 1980.

Opinion and Order on Post-Trial
Motions Feb. 25, 1981.

Lowell H. Jacobson, James A. Brandvik, Craig E. Anderson, Jacobson & Brandvik, Chicago, Ill., for plaintiff.

Terry M. Grimm, David S. Acker, Robert G. McCoy, Winston & Strawn, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

On May 1, 1974, Gorman Publishing Company ("Gorman"), agreed to employ Thomas R. Stillman as "publisher" of Canner/Packer, a magazine it had just acquired. This agreement contained a covenant restricting Stillman from working for any competitive magazine for a period of two years following termination of his employment with Gorman. Stillman resigned his position as publisher on January 6, 1976, but signed a new agreement with Gorman to work as a salesman for three months. Stillman signed yet another agreement with Gorman on April 8, 1976, under which he would be paid for three more months. In both of these agreements, Stillman reaffirmed his intention not to compete with Gorman. In June of 1976, Stillman accepted employment with Fairchild Electronic News, a magazine not competitive with Canner/Packer. He resigned from this position in July of 1977, and accepted employment with the Chilton Company, to work on Food Engineering magazine. Gorman brought this action against both Stillman and Chilton claiming that Stillman's employment with Chilton violated his agreement not to compete. A trial was held before this court on June 4–9, 1980. The court hereby enters the following findings of fact and conclusions of law.

The non-compete covenant in the May 1, 1974, agreement between Gorman and Stillman provides as follows:

"It is expressly agreed that at no time during the term of this Agreement, or for a period of two (2) years immediately following the termination of the employment, if the termination was initiated by Employee or initiated by Gorman 'for cause,' as is herein defined in this Agreement, will Employee, for himself, or on behalf of any other person, firm, partnership, or corporation, directly or indirectly, engage in a business directly competitive with Company anywhere in the United States or the foreign areas where the Company has done business or has planned or scheduled business."

The agreement provides for liquidated damages of $500 per day in the event of a breach of this covenant. These provisions of the agreement were the subject of negotiation between the parties' attorneys, and Stillman himself made objections to some of them. Stillman was thus fully aware of their import.

During the course of Stillman's employment with Gorman, disagreements developed about the scope of Stillman's responsibilities. Stillman felt that he was spending too much time as a salesman and was not being given the authority that should be

accorded a publisher. In addition, Stillman several times expressed his dissatisfaction with certain editorial policies of the magazine. William Gorman, Executive Vice-President and a principal shareholder of Gorman, testified that Stillman did in fact have considerable responsibility in running the magazine, but that he was an "impatient young man" who demanded more responsibility than he was ready for. William Gorman further testified that a great deal of effort was expended in training Stillman to be a publisher.

Matters came to a head in December, 1975. At the Gorman Christmas party, Stillman again expressed to William Gorman his dissatisfaction with the amount of responsibility he was given. There is a conflict in the testimony as to whether Stillman told William Gorman that he intended to resign, or merely stated that "it may be in the best interest [of everyone], because of the way things were going, that I should resign." Stillman went on vacation, and following his return, met with William and John Gorman on January 6, 1976, at the Drake Hotel in Chicago. Stillman testified that the Gormans told him to resign at this meeting. William Gorman testified that it was Stillman who stated that he had finalized his decision to resign. On that same date, Stillman prepared a resignation letter which read in part as follows:

"Effective today . . . I do formerly [sic] resign from my position at Gorman Publishing Company as Publisher of CANNER/PACKER Magazine.

. . . .

"Please understand that I have no intention of associating myself with, or engaging in employment with, any trade journal directly or indirectly competative [sic] to CANNER/PACKER Magazine without written permission from one or more officers of Gorman Publishing Company.

"It is with deep regret that I submit this resignation, however, I feel it is in the best interests of both Gorman Publishing Company and my own personal requirements."

This letter, which was also signed by John and William Gorman, further provided that Stillman would receive full salary and earned commission for the following three-month period.

Stillman made only a few sales calls for Gorman in the three months following his resignation as publisher. In March of 1976, Stillman informed William Gorman that he had tentatively accepted a position with the Putnam Publishing Company. This company published a magazine serving the food industry, but Stillman proposed that he would work only with a chemical magazine also published by Putnam. William Gorman objected to this employment, and offered to employ Stillman as an "independent consultant" for three additional months. On April 8, 1976, Stillman signed a letter sent to John and Bill Gorman which read in part as follows:

"This is to further supplement my letter of resignation dated January 6, 1976, in connection with the May 1, 1974 employment agreement.

"I agree that for two years after my final separation from Gorman Publishing Company I will not, directly or indirectly, work for or be associated with in any capacity any company or business which owns or publishes, directly or indirectly, any business or trade journal or magazine, directly or indirectly, competitive with CANNER/PACKER or BAKERY PRODUCTION AND MARKETING magazine including, but not limited to, the following companies: Putnam, Chilton, Sosland.

. . . .

"I reaffirm my agreement to be bound by all the terms of the May 1, 1974 employment agreement particularly the non-competitive paragraphs 5 and 6 as they are found on pages 4 and 5 of that agreement which I agree shall run for two years from the date of my final separation from Gorman Publishing Company and shall cover the above mentioned competitive businesses and magazines.

"You have agreed to employ me as an independent consultant for a period of three months from the date of this letter at a fee of $1650.00 per month...."

Stillman performed no consulting services for Gorman under this agreement.

In June or July of 1976, Stillman began working for Fairchild Electronic News, a magazine not competitive with Canner/Packer, in Los Angeles, California. In July, 1977, Stillman met with Tom Morie, publisher of Food Engineering, of the Chilton Company to discuss possible employment with Chilton. Stillman resigned from Fairchild on July 25, 1977, and the next day sent a telegram to Morie, indicating his willingness to work for Chilton. In August of 1977, Stillman attended a sales meeting of Food Engineering salesmen. Also, in that month, Chilton was informed by attorneys for Gorman that their proposed hiring of Stillman would violate his agreements with Gorman "and would require action by Gorman against all parties including those who would employ him and engaged in the 'tortious interference of contract.'" To avoid such problems, Stillman called William Gorman and offered to postpone his employment with Chilton until January 6, 1978. This offer was not accepted. Chilton also considered employing Stillman in ways that might not be considered competitive with Gorman until the Gorman contract ran out.

On October 3, 1977, Stillman began his employment with Chilton as National Sales Manager for Food Engineering Magazine and Food Engineering Master, a catalog. Chilton sent Stillman a letter, which he signed, informing him of the possible legal consequences of his employment. This letter provided in part:

"You [Stillman] hereby agree that if as a consequence of your employment with Chilton, Chilton becomes involved, directly or indirectly, in any law suit or other action brought by Gorman or any other party, claiming a violation by you of any of the foregoing agreements or otherwise acting wrongfully by employing you, Chilton may discharge you forthwith, if in its sole judgment it considers itself to be running an unacceptable risk of damages or loss or of incurring substantial legal fees or expenses....

"Chilton hereby agrees to pay any legal fees and expenses, including personal expenses reasonably incurred by you, in preparation for the defense of any law suit or threatened action by Gorman prior to the date Chilton, if it so elects, terminates your employment hereunder. In addition, Chilton will indemnify and hold you harmless against any monetary judgments rendered or court costs assessed against you ...."

In September, 1978, following the death of Tom Morie, Stillman became the publisher of Food Engineering and Food Engineering Master.

I. *Breach of the Non-Compete Covenant*

As the foregoing discussion of the facts shows, there can be no question in this case that Stillman signed the three non-compete agreements with his eyes open, and that Gorman made clear to him from the beginning that a major concern of theirs was that he might work for a competitor in the future. It is equally clear that Stillman and Chilton were fully aware at the time Stillman began his employment with that company, that this employment violated the letter of Stillman's agreement with Gorman. For these reasons, the major issue in this case has not been the breach, but has rather been the reasonableness of the non-compete agreement. Nevertheless, defendants advance several arguments that the non-compete agreement was never breached.

■ Defendants contend that the non-compete covenant in the May 1, 1974, agreement never became operative, because it only applies if the termination was initiated by Stillman or if it was initiated by Gorman "for cause." There is no dispute that the termination was not initiated "for cause." Stillman contends that because he was told to resign by the Gormans, he did not initiate his termination. The court must find otherwise. Although there is a dispute as

to whether Stillman told William Gorman in December, 1975, that he would resign, or whether he was merely considering resignation, there is no dispute that Stillman initiated the discussions of his resignation. In January, the Gormans may have suggested that Stillman should resign, although William Gorman denies making such a suggestion. In any event, the resignation letter submitted by Stillman states that his resignation was voluntary. Stillman chose to submit a letter in this form, rather than risk discharge, and must accept the consequences of his decision. One of those consequences is that he is not released from his non-compete agreement.

■ Defendants further argue that the termination was initiated by Gorman because Stillman was "constructively discharged" from his position as publisher. The constructive discharge is said to have arisen from the Gormans' failure to give Stillman the responsibilities that should have been associated with his position. Defendants rely upon *Brock v. Mutual Reports, Inc.*, 397 A.2d 149, 152 (D.C.App. 1979), where the court stated that "when an employee contracts to fill a particular position any material change in duties or significant reduction in rank will constitute a constructive discharge which, *if unjustified*, is a breach of contract." This case is distinguishable from *Brock* in two respects. First, Stillman was not actually demoted; rather, he was given less responsibility than he would have liked. In fact, it appears that Stillman's authority increased while he worked for Gorman, albeit not as quickly as he would have liked. Second, the job of publisher was not so well defined either within the industry or between the parties, that it can be said that Gorman's failure to give Stillman the authority he hoped for amounted to a constructive discharge. The court concludes that Stillman's termination was not initiated by Gorman, that it was initiated by Stillman, and therefore, that the non-compete clause is operative.

■ Finally, defendants argue that Stillman's employment with Chilton did not violate the non-compete covenant because the magazines Food Engineering and Canner/Packer are not "directly competitive." This argument flies in the face of much of the evidence presented at trial, which showed that at least to some extent, the magazines serve similar markets, and that both Chilton and Gorman considered their magazines to be competitors. The court must conclude, therefore, that Stillman's employment with Chilton, which the court finds began on October 3, 1977, violated the terms of the May 1, 1974, employment agreement signed by Stillman.

II. *Validity of the Non-Compete Covenant*

■ Under Illinois law, a covenant not to compete, such as the one at issue in this case, is not enforceable unless the employer can demonstrate that a "protectible interest" justifies it, and that it is reasonably limited in scope. *See, e. g., House of Vision, Inc. v. Hiyane*, 37 Ill.2d 32, 225 N.E.2d 21 (1967). Though the defendants have raised some objections to the scope of this covenant, these objections are not well taken. The covenant only bars Stillman from employment with Gorman's competitors. This provision was certainly reasonable insofar as Gorman had interests that required protection, and it was not unduly burdensome, as is witnessed by the fact that, prior to working for Chilton, Stillman was able to find work with a magazine that did not violate the covenant's terms. In view of the limited number of jobs to which the covenant applied, the temporal and geographic restrictions must also be viewed as imposing only an insignificant burden. Moreover, the fact that the covenant applied nationwide was justified by the nationwide nature of Gorman's business. *Cf., Wessel Co. v. Busa*, 28 Ill.App.3d 686, 691–692, 329 N.E.2d 414 (1st Dist. 1975). Thus, the central question in determining the covenant's validity is whether or not the covenant was designed to protect a legitimate business interest.

■ Normally a covenant not to compete will be enforced against a former employee who is privy to "specialized knowledge, such

as secret processes or the like." *House of Vision*, 37 Ill.2d at 37, 225 N.E.2d 21. Gorman has sought to attribute such knowledge to Stillman in several respects. Specifically, it is argued that Stillman had confidential knowledge as to Gorman's finances, editorial staffing problems, salary structure, public relations problems, circulation list, circulation methods, and Gorman's advertisers.

The cases dealing with confidential information are many and varied, and the only truly useful generalization that can be drawn from them is the one offered by the Illinois Appellate Court in *Wessel Co. v. Busa*, 28 Ill.App.3d 686, 329 N.E.2d 414 (1st Dist. 1975):

"Each case must be determined according to its own particular facts and circumstances which by necessity vary as to time, area, and degree of confidential relationship between employer and employee." 28 Ill.App.3d at 691, 329 N.E.2d 414.

*See also Donald McElroy, Inc. v. Delaney*, 72 Ill.App.3d 285, 291, 27 Ill.Dec. 892, 389 N.E.2d 1300 (1st Dist. 1979). Here is it not seriously disputed that Stillman had considerable knowledge about Canner/Packer's operation. While it is probably the case that certain aspects of this knowledge standing alone would not justify enforcement of the covenant not to compete, the court must conclude that taken as a totality Stillman's intimate understanding of Gorman's business gave Chilton an unjustified competitive advantage. Certainly the Illinois courts have been willing to enforce non-compete clauses under closely analogous circumstances. *E. g., Donald McElroy, Inc. v. Delaney, supra.*[1]

Moreover, even if the entirety of Stillman's knowledge were not enough to justify enforcing the covenant, and even though certain specific aspects of that knowledge do not suffice, at least one aspect of Stillman's knowledge would, standing alone, require a finding that the covenant is enforceable. The crucial aspect of Stillman's knowledge is his knowledge concerning Gorman's advertisers. Defendants argue that the names on Gorman's advertising lists could be readily obtained from public sources, indeed, from the pages of Canner/Packer itself. They therefore conclude that Stillman's knowledge about advertisers was not protectible and cite in support of their claim several Illinois cases. *Image Supplies v. Hilmert*, 71 Ill.App.3d 710, 28 Ill.Dec. 86, 390 N.E.2d 68 (1st Dist. 1979); *Haag Brothers, Inc. v. Artex International*, 60 Ill.App.3d 141, 17 Ill.Dec. 490, 376 N.E.2d 636 (1st Dist. 1978); *McCormick v. Empire Accounts*, 49 Ill.App.3d 415, 7 Ill.Dec. 259, 364 N.E.2d 420 (1st Dist. 1977); *Murphy v. Murphy*, 28 Ill.App.3d 475, 328 N.E.2d 642 (5th Dist. 1975). While each of these cases supports the proposition that a covenant not to compete is not enforceable where the employee is merely aware of the identity of the employer's customers and where the information is readily available to any member of the public, the testimony adduced at trial established that Stillman's knowledge was much more extensive. Thus, it was revealed that Stillman knew and was capable of remembering not only who Canner/Packer's advertisers and advertising prospects were, but also which individuals in these companies were most responsible for advertising decisions and how these individuals could most effectively be approached. Moreover, while plaintiff's expert did testify as to how an outsider could construct a list of advertising pros-

---

[1]. Plaintiff seeks to raise this argument to the level of an evidentiary presumption: namely, that any high level employee, like Stillman, is privy to protectible information. The cases relied on, however, do not state such a rule of law. In each of them the court discusses specific knowledge acquired by the employee and treats that knowledge as the foundation for the covenant. While some of the decisions are sketchier on this point than others, and while it is probably a valid generalization that high level employees are proper subjects for restrictive covenants, the court declines to grant this generalization any legal status. It is also to be noted in this regard that Illinois courts have refused to enforce non-compete clauses against high level employees in some cases. *E. g., McCormick v. Empire Accounts Service, Inc.*, 49 Ill.App.3d 415, 7 Ill.Dec. 259, 364 N.E.2d 420 (1st Dist. 1977); *Statistical Tabulating Corp. v. Hauck*, 10 Ill.App.3d 50, 293, N.E.2d 900 (1st Dist. 1973).

pects like the one revealed to Stillman, he also testified that not all of the additional information known to Stillman was readily obtainable and that this information could only be obtained at considerable expense. Under analagous circumstances the Illinois courts have not hesitated to uphold covenants not to compete. *E. g., Shorr Paper Products, Inc. v. Frary*, 74 Ill.App.3d 498, 30 Ill.Dec. 280, 392 N.E.2d 1148 (2d Dist. 1979); *Office Electronics, Inc. v. Grafic Forms*, 56 Ill.App.3d 395, 14 Ill.Dec. 320, 372 N.E.2d 125 (2d Dist. 1978); *Wessel Co. v. Busa*, 28 Ill.App.3d 686, 329 N.E.2d 414 (1st Dist. 1975). Accordingly, the court concludes that the covenant not to compete was reasonably drawn to protect a legitimate interest and was enforceable.

### III. *The Claim for Tortious Interference*

■ In addition to seeking relief from Stillman for his breach of the covenant not to compete, the complaint states a claim against Chilton for tortiously interfering with that contractual relationship. The Seventh Circuit has construed the Illinois law on this point succinctly:

> "The essential elements of this tort . . . are: (1) defendant's knowledge of the existing contract; (2) the inducement; (3) the subsequent breach by the third person; and (4) damages to the plaintiff." *Republic Gear Co. v. Borg-Warner Corp.*, 406 F.2d 57, 61 (7th Cir. 1969).

There is no serious dispute that the record amply establishes the first two elements of the tort. As to the requirement that the contract was breached, that issue has been dealt with in some detail in the earlier portions of this opinion. The final element of the tort, the required showing of actual damage, is the principal factual matter in dispute. However, the record clearly indicates that Canner/Packer's advertising sales leveled off dramatically once Stillman began selling for Food Engineering. While defendants argue that there is no evidence specifically linking the two events, the court concludes that the facts which justify enforcing the covenant to begin with also justify the inference that Stillman's breach

of the covenant was at least a contributing factor in Canner/Packer's reduced rate of growth. Thus, the harm suffered by Gorman was sufficiently concrete to establish the tort.

■ In addition to this factual dispute, there is one legal controversy in connection with the claim against Chilton. Defendants argue that, in addition to the previously enumerated matters, plaintiff is required to establish that the interference with its contract was "malicious." While some of the Illinois cases do use such language it is well established that the malice involved is not a matter of "ill will," but merely a lack of justification for the defendant's intentional conduct. *E. g., Marcus v. Wilson*, 16 Ill. App.3d 724, 730, 306 N.E.2d 554 (1st Dist. 1973). Defendants' contention that Chilton's conduct was justified by its desire to secure the benefit of Stillman's undisputed abilities is inadequate. To hold otherwise would amount to holding that any interference with a contractual relationship is justified so long as it is beneficial to the interfering party. Such a result cannot be proper.

In sum, the court concludes that, by accepting employment with Food Engineering, Stillman breached a valid covenant not to compete and that Chilton tortiously induced him to do so. This leaves the question of damages.

### IV. *Damages*

The proper measure of damages in this case revolves around two questions: first, the period of time covered by the covenant, and second, the propriety of the covenant's liquidated damages provision.

#### A. *The Temporal Scope of the Covenant*

The non-compete clause in Stillman's original contract of employment was, by its own terms, operative for "two (2) years following the termination of employment." At issue is whether this two-year period is to be measured from the date of Stillman's initial resignation (January 6, 1976), from the date on which Stillman and Gorman revised the terms of that resignation (April

8, 1976), or the date on which Stillman began to work for an organization other than Gorman (June or July of 1976). Plaintiff's theory is that Stillman continued to receive income from Gorman until the summer of 1976, that this income was received under instruments meant to supplement and extend the original employment agreement, and that, accordingly, Stillman was employed under the modified terms of that original agreement—including the non-compete clause—until he actually began working for another publisher. Thus, plaintiff's theory is that the two-year non-compete period began in the summer of 1976 and defendants are liable for all injuries suffered up to the summer of 1978. Defendants' position is that Stillman's employment under the original agreement terminated with his resignation on January 6, 1976, and that the "supplementary" agreements were, in fact, totally new contracts, neither of which contained an enforceable covenant not to compete. They, thus, contend that the damages period ended January 6, 1978.

The January 6 letter of resignation states that "Effective today . . . I do formerly [sic] resign from my position at Gorman Publishing Company as Publisher of CANNER/PACKER Magazine." This is not, on its face, a document supplementing the original agreement, but, instead, a document terminating that agreement. The fact that Stillman continued to perform certain limited sales tasks for Gorman's benefit, the fact that the letter stated that he would receive his former salary for a period of three months, and the fact that the letter stated that he had "no intention of associating myself with . . . any trade journal directly or indirectly competative [sic] to CANNER/PACKER Magazine" do not alter the letter's legal effect. The relationship between Stillman and Gorman contemplated in these provisions is entirely different from the relationship contemplated by the original employment agreement. Moreover, as has been noted above in connection with the breach issue, the decision to frame the January letter as a resignation—a voluntary termination of employment—was not without its advantages from Gorman's point of view. It would be more than a little bit anomalous for this court to give weight to the form of this document in determining whether the non-compete clause was breached, but none whatsoever in resolving the issue of damages. This is particularly true since the record establishes that the January letter was the product of a full day of negotiations between Stillman and the Gormans and since that letter bears the signatures of John and William Gorman as well as Stillman's.

Additionally, the court notes that the letter's mention of Stillman's "intention" not to compete did not give rise to an entirely new, enforceable, covenant. Assuming that an intention not to compete is the same thing as a promise not to compete, the fact that the language of the January letter contains no temporal limitations, coupled with the fact that Stillman performed only minimal services after the letter was submitted combine to suggest that any covenant intended by the draft of the January letter was not reasonably drawn and did not serve to protect any legitimate business interest. In short, the January letter did not toll the running of the two-year non-compete period.

Nor did the letter sent by Stillman to the Gormans on April 8, 1976, toll the running of the two-year period. This letter contained Stillman's promise "that for two years after my final separation from Gorman Publishing Company I will not, directly or indirectly, . . . be associated with . . . any company . . . which . . . [is] . . ., directly or indirectly competitive with [Gorman]." It also contained Stillman's "reaffirmation" of the provisions of his original employment agreement, "particularly the non-competitive paragraphs . . . which I agree shall run for two years from the date of my final separation from Gorman Publishing Company." The letter also provided that Stillman would be paid some $1650 each month to serve as "an independent consultant."

Though Gorman claims that it attempted to reach Stillman for consultation on several occasions during the life of this agree-

ment, it is admitted that no consultations actually took place, and there is no evidence suggesting that Gorman sought to enforce its right to Stillman's services. Moreover, the record unarguably establishes that the agreement memorialized in this letter was entered into for the sole purpose of keeping Stillman from accepting a job with a magazine that was not in competition with Canner/Packer.

It is axiomatic that an agreement in restraint of trade is not enforceable unless ancillary to an otherwise valid contract. *Restatement of the Law of Contracts* § 515. It is an obvious corollary of this proposition that where, as here, a covenant not to compete is entered into after the underlying employment relationship is terminated, no enforceable rights arise. *E. g., Bond Electric Corp. v. Keller*, 113 N.J.Eq. 195, 166 A. 341 (1933). Consequently, it cannot be argued that the April 8 letter gave rise to a new and enforceable covenant. If it is Gorman's position that the "consulting" agreement provided the legitimizing substrate, that position is untenable. Aside from the fact that the parties' behavior belies any serious intent to create a new, legitimate employment relationship, there is no showing on the record that Stillman's consultancy gave rise to any properly protectible interests.

Plaintiff's alternative position—that the April letter was meant to "supplement" and clarify the original employment agreement—is equally unpersuasive. If the argument is that the April letter comprised a modification of the original agreement, that modification was invalid for the same reason that the "consulting" agreement was invalid. A modification of a contract is itself a contract and, as such, is only enforceable where the ordinary standards of contract law are satisfied. *Faith v. Martoccio*, 21 Ill.App.3d 999, 1004, 316 N.E.2d 164 (2d Dist. 1974). Here the alleged modification affected the terms of the original covenant not to compete. As already noted, a covenant not to compete will not be deemed enforceable when it is formed after the underlying employment relationship is ter-

minated. Since the employment relationship underlying the original employment agreement was terminated in January, no modification of the non-compete provisions of that agreement could validly be effected in April. At the most, the April letter is parol evidence as to the meaning of the original agreement. The court, however, finds the language of the original agreement sufficiently clear as to require no interpretative aids.

In short, the original employment agreement contemplated that Stillman would not compete with Canner/Packer for a period of two years after its termination. That termination occurred on January 6, 1976, with the result that Stillman was in breach of his contractual obligations only insofar as he engaged in competition with Gorman prior to January 6, 1978. Nothing that happened on or after January 6, 1976, changed this result. Since Stillman did not begin work for Chilton until October 3, 1977, he was in breach of the non-compete clause for a period of only 95 days. The question now is the proper measure of damages for this breach of contract.

## B. *Liquidated Damages*

The original employment agreement provided that, in the event of a breach of the non-compete clause, damages would be assessed at $500 per day. Defendants contend that damages should not be set at this figure because it is not a "reasonable forecast of just compensation for the harm that is caused by the breach" and, because, for that reason, it is "punitive" in nature. *See Bauer v. Sawyer*, 8 Ill.2d 351, 359, 134 N.E.2d 329 (1956).

Defendants are correct in contending that the evidence cannot support a finding that the $500 a day figure was meant as an accurate forecast of the costs likely to arise from a breach. However, a provision for liquidated damages is also enforceable where "the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation." *Bauer, supra.* Here, even after the breach has

occurred, the precise extent of injury suffered by Gorman is impossible to determine. While, as was pointed out above, the evidence justifies the view that some actual damage was suffered, the court cannot begin to imagine how to determine which specific advertising accounts were lost to Canner/Packer because of Stillman's competition, or how much those accounts would have been worth to Canner/Packer had they stayed. Moreover, the record shows that the $500 a day figure was arrived at after a process of serious negotiation between sophisticated parties assisted by counsel who were even more aware than this court of the ambiguous nature of the interests being protected. It is significant in this regard that the first draft of Stillman's contract called for liquidated damages of $1000 a day, a sum which was reduced in the course of negotiations. For all of the above reasons, the court must conclude that damages of $500 a day is a fair and reasonable assessment of the injury Gorman has suffered. Accordingly, the court finds the liquidated damages provision to be reasonable and the appropriate measure of damages under all the circumstances of this case.

For all of the above reasons, the court hereby enters judgment against both of the defendants in the sum of $47,500.

## MEMORANDUM OPINION AND ORDER ON POST–TRIAL MOTIONS

This is an action for enforcement of a covenant not to compete. A bench trial was held on June 4–9, 1980. On October 21, 1980, this court filed a memorandum opinion entering a judgment in favor of plaintiff Gorman Publishing Company in the sum of $47,500. The facts of this case are extensively set out there. A number of post-trial motions are currently pending:

(1) Defendants' motion for a new trial.

(2) Plaintiff's motion to strike affirmative defenses.

(3) Plaintiff's motion to strike deposition testimony.

(4) Plaintiff's motion to amend the memorandum opinion and order.

(5) Defendants' motion to amend the memorandum opinion and order.

Each motion is dealt with below.

I. *Defendants' motion for a new trial and plaintiff's motion to strike affirmative defenses.*

Defendants, Thomas Stillman and the Chilton Corporation, seek to reopen the evidence in this case for two reasons. First, they indicate that they wish to adduce additional expert testimony as to advertising practices in the controlled circulation magazine business. Such testimony would be merely cumulative of the expert testimony given at trial. Accordingly, the court declines to reopen the evidence for this purpose.

Defendants' second reason for wishing a new trial is their claim that they were denied their right to a jury. Stillman and Chilton have argued throughout this litigation that Stillman's performance of his promise not to compete was excused for two reasons: First, because of Gorman's breach of certain material terms of the employment contract, and second, because Stillman was discharged from his job without good cause. In the October memorandum opinion this court concluded both of these issues against the defendants. The court also addressed these issues in a memorandum opinion dated November 19, 1979. That opinion entered a summary judgment order dismissing Stillman's counterclaim. The counterclaim had alleged that the facts underlying these affirmative defenses also gave rise to a cause of action for breach of contract. Plaintiff's position is that the summary judgment order disposed of the affirmative defenses, and since there never has been any dispute about the court's right to determine the reasonableness of the covenant not to compete, that no jury question remains. Defendants contend that the summary judgment order did not dispose of the affirmative defenses, and that they were entitled to argue those defenses to a jury. After carefully reviewing its various orders, the trial transcript and other material on file, the court concludes that the motion for new trial must be denied. ·

Defendants argue that the affirmative defenses raise two questions of fact: First, whether Stillman was discharged from his job without cause, and second whether Gorman breached the stock option provision of Stillman's employment contract.

The covenant not to compete applies, by its terms, only in the event that Stillman resigned from his job or in the event he was discharged for cause. The summary judgment order found that Stillman resigned his job, and that no question of fact existed on this issue. There is no dispute that Stillman wrote a letter stating that he resigned his position with Gorman Publishing. Even if Stillman was "ordered" to do so, as is his contention, the fact remains that he chose to comply with this order, terminating his employment in this manner rather than risk a discharge. He is bound by this decision.

Stillman has sought to avoid this result by arguing that he was "constructively" discharged from his job. That is, he has argued that, regardless of the form of his termination, Gorman was responsible for bringing the employment relationship to an end because it refused to give him responsibilities consistent with his position as publisher. In making this argument, defendants rely on the holding in *Brock v. Mutual Reports, Inc.*, 397 A.2d 149 (D.C.App.1979):

> "When an employee contracts to fill a particular position any material change in duties or significant reduction in rank will constitute a constructive discharge which, if unjustified, is a breach of contract." 397 A.2d at 152.

There has never been any evidence produced in this case tending to show that Stillman's responsibilities were decreased with the passage of time. Indeed, both the evidence that was available at the time the initial summary judgment was entered and the evidence adduced at trial indicated that Stillman's responsibilities increased during his tenure. Consequently, it is hard to see how there is any jury question as to whether Stillman suffered "any material change in duties or significant reduction in rank."

■ If it is defendants' position that Stillman was promised greater responsibilities at the time he was offered the job and, thus, that his duties were "materially changed" at the outset, this contention too is wholly unsupported by the record. While Stillman's initial vision of his responsibilities may well have been grander than the reality, the record is unequivocal in showing that Gorman's was not. Arguably, this hidden initial disagreement meant that the parties never had a "meeting of the minds" on this issue, thus vitiating the force of the entire contract, including the non-compete clause. However, even this possibility does not raise a triable jury question. The fact that the parties failed to agree on one term of a contract does not necessarily mean that no contract was formed at all. Here it is undisputed that Stillman stayed with Canner/Packer for more than a year and a half, and that he accepted all the benefits his labors entitled him to. It is a well established principle of Illinois law that such conduct works a ratification of an imperfectly formed agreement. *E. g., Bi-County Properties v. Wampler*, 61 Ill.App.3d 799, 805, 18 Ill.Dec. 847, 378 N.E.2d 311 (5th Dist. 1978); *Amelco Electric Co. v. Arcole Midwest Corp.*, 40 Ill.App.3d 118, 124, 351 N.E.2d 349 (1st Dist. 1976). In short, there is no theory on which the nature of Stillman's termination can be said to raise a jury question.

■ The second question said to be raised by defendants' affirmative defenses is whether or not Stillman's breach of the non-compete clause was excused by Gorman's alleged breach of the stock option provisions of the employment agreement. It is Stillman's position that he asked to exercise his stock option, and that Gorman refused to honor this request. Even assuming Gorman breached the stock option clause,[1] the record as it presently stands

---

1. In the summary judgment order of November 19, 1979, the court found that Stillman could not state a claim for this alleged breach of contract. The court so held on the ground that

Stillman had adduced no evidence tending to show that he had made an effective request to exercise his stock option. Stillman has pointed to certain passages in his deposition that do

establishes as a matter of law that this conduct did not excuse Stillman's breach of the covenant not to compete. As the Seventh Circuit has pointed out,

"A non-breaching party faced with the dilemma of whether to perform in the face of the other party's breach may elect to avoid the contract or treat the contract as in full force and retain the right to sue for damages arising from the breach." *Saverslak v. Davis-Cleaver Produce Co.,* 606 F.2d 208, 212 (7th Cir. 1979).

Here Stillman continued to work for Gorman for close to eight months after Gorman's alleged anticipatory breach of the stock option clause. During this time, of course, he continued to draw a salary and to accept the other benefits provided by his agreement. This course of conduct seems to imply that Stillman chose to "treat the contract as in full force . . . , retain[ing] the right to sue" rather than "avoid[ing] the contract" altogether. The fact that Gorman relied on this decision to its detriment (by continuing to pay Stillman), makes Stillman's election of remedies legally binding, and estops him from contending that Gorman's breach voided the contract in its entirety. *Kentucky Natural Gas Corp. v. Indiana Gas and Chemical Corp.,* 129 F.2d 17 (7th Cir.), *cert. denied,* 317 U.S. 678, 63 S.Ct. 161, 87 L.Ed. 544 (1942); *Saverslak, supra,* 606 F.2d at 213, 214. Consequently, Gorman's alleged refusal to honor the stock option does not establish an affirmative defense to Stillman's breach of the covenant not to compete, and no jury question remains on this issue.

For all of the above reasons, defendants' motion for a new trial must be denied, and plaintiff's motion to strike affirmative defenses must be and is granted.

## II. *Plaintiff's motion to strike deposition testimony.*

At the end of defendants' case, defendants' counsel sought to introduce into evidence certain specified portions of Stillman's deposition. Though no specific hearsay exception was cited at the time, the relevant provision in the Federal Rules is F.R.Ev. 801(d)(1)(B), relating to prior statements by a witness consistent with his trial testimony.[2] Plaintiff objected to this evidence at the time of its introduction. When overruled, he counter-designated the remainder of the deposition.

Rule 801(d)(1)(B) authorizes the introduction of prior consistent statements when "offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." Plaintiff's present argument is that he counter-designated portions of the deposition only because defendants' designations had been admitted, and that defendants' designations should never have been admitted because Stillman's live testimony was never attacked as being "recent[ly] fabricat[ed]" or prompted by an "improper influence or motive." Plaintiff is correct. Stillman's testimony was never attacked on any of these grounds. Accordingly, the deposition never should have been admitted, and it is hereby stricken from the trial record.

The court notes, however, that this ruling in no way affects any of its previous decisions as to the merits. A review of the memorandum opinion of October 21, enter-

---

tend to indicate that he orally requested the stock. However, the stock option expressly states that it can only be exercised during the last three months of the first two fiscal years of Stillman's employment. Stillman's own account of his request indicates that he was told that the request was untimely. There is no evidence in the record to the contrary. Moreover, even if the request had been timely, still no cause of action would arise. The stock option provision required that, upon leaving the company, Stillman was obligated to sell any shares purchased by exercise of the option back to the company at book value. The rec-

ord is uncontradicted in showing that the company had a negative book value throughout the period of Stillman's employment. Accordingly, Gorman's alleged breach gave rise to no recoverable damages.

2. Contrary to the court's earlier ruling, it is now recognized that the deposition could not be admitted on defendants' motion as an admission under Rule 801(d)(2). This is because the deposition was Stillman's own statement, and hence, not "offered against" him. F.R.Ev. 801(d)(2).

ing judgment for plaintiff, indicates that the court's findings there were supported by evidence and exhibits introduced at trial other than the Stillman deposition. Consequently, striking the deposition at this late date does not disturb any of the results reached in that opinion. Additionally, the court notes that, even though the deposition has been struck from the trial record, it was still necessary to evaluate the contents of the deposition in connection with the motion for a new trial. As indicated above, the court disposes of that motion on the grounds that no material question of fact has been raised for a jury to hear. In order to reach this conclusion, it is necessary that the court consider all of the evidentiary material tending to show what those issues might be. This certainly includes Stillman's deposition. As was also indicated above, consideration of the Stillman deposition in this connection does not compel a second trial.

III. *Plaintiff's motion to amend the memorandum opinion and order.*

Plaintiff's motion to amend the memorandum opinion and order objects to the court's failure to include an award of costs and fees as part of the judgment in plaintiff's favor. Clearly, the covenant not to compete contemplates such an award:

> "In the event of a violation of this Agreement by Employee, the Company shall be entitled to receive and recover all enforcement costs, including investigative costs, court costs, and reasonable attorneys' fees."

While the court would normally require the defendants to honor this stipulation, certain of the facts in this case mandate a different result.

▮ The memorandum opinion of October 21 established that the covenant not to compete expired on January 6, 1978. Uncontroverted evidence in the record shows that Stillman offered to refrain from accepting Chilton's offer of employment until after this date, and that Gorman turned this offer down, apparently in the belief that its rights under the covenant were

more extensive. It was not until after this exchange that Stillman became a Chilton employee. In short, the record establishes that Gorman could have obtained everything it was legally entitled to by way of compliance with the covenant not to compete without bringing this lawsuit. This does not excuse Stillman's eventual breach of the covenant, and that is why Gorman is entitled to be compensated with damages.

Gorman could thereby have avoided injury simply by agreeing to Stillman's proposal. To grant a fee award under these circumstances would be to reward Gorman for striking a bargaining posture under which it insisted on more than it was legally entitled to. Sound policy forecloses a damage award that would subsidize such overreaching. Moreover, both the language of the contract and the relevant case law grant these policy considerations legal weight.

The contract does not stipulate that Stillman will be unqualifiedly liable for any and all attorney's fees. Rather, the contract only imposes an obligation to pay for "reasonable" fees. Here, plaintiff only incurred legal expenses because, at a time when breach could have been avoided, it insisted on performance beyond the scope of the contract. A more reasonable attitude would have assured plaintiff of full performance. The court concludes that Stillman's obligation to pay "reasonable" attorney's fees does not obligate Stillman to pay for Gorman's intransigence.

Numerous cases have made a similar point. Thus, where a defendant has tendered an amount less than the amount claimed but greater than or equal to the amount actually due, the courts have been willing to ignore contractual stipulations indemnifying one party or another for costs and attorney's fees incurred in enforcing the contract. *Cable Marine, Inc. v. M/V Trust ME II*, 632 F.2d 1344 (5th Cir. 1980); *Manchester Gardens v. Great West Life Assurance Co.*, 205 F.2d 872, 878, n. 14 (D.C. Cir.1953); *Thompson v. Crains*, 294 Ill. 270, 128 N.E. 508 (1920). The courts have also ignored such stipulations where the party

seeking enforcement was partly to blame for the breach. *U. S. v. Mountain States Construction Co.*, 588 F.2d 259, 263 (9th Cir. 1978). The doctrinal justification for such revisions of the parties' agreement is unclear. Indeed, the decisions tend to either refer mysteriously to the courts' apparently inherent "discretion" in these matters, *Cable Marine, supra; Mountain States, supra,* or simply to ignore the problem of justification altogether, *Manchester Gardens, supra.* *Cf., Thompson,* 294 Ill. at 282, 128 N.E. 508 (holding that tender of amount actually due meant that no breach had occurred). This court finds justification for its decision in the longstanding rule that all contracts contain an implied covenant of good faith and fair dealing. *See generally,* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv.L.Rev. 369 (1980). This covenant clearly forecloses any attempt to enforce a portion of an indemnity agreement where it is the enforcing party's insistence on performance beyond the terms of the contract that leads to litigation.

Accordingly, for all of the above reasons, the court concludes that plaintiff's motion to amend the memorandum opinion and order must be denied. Plaintiff is not entitled to fees and costs in this case.

### IV. *Defendants' motion to amend the memorandum opinion and order.*

Defendants seek to have this court amend its memorandum opinion and order of October 21 in several respects. Paragraphs 1–8 of the motion seek to have the court incorporate certain additional findings of fact into the opinion. Having reviewed these proposed findings, the court concludes that they are either irrelevant to its holding or unsupported by the record taken as a whole. Accordingly, the court declines to amend the memorandum opinion.

Paragraph nine of the motion points out that the court mistakenly referred to defendants' expert as "plaintiff's" expert at page 105, of the opinion. Defendants are correct, and the word is hereby ordered changed.

Finally, defendants seek to amend the memorandum opinion to eliminate any finding of damages. Defendants argue that Gorman is estopped from seeking damages because of its refusal to promise to refrain from filing suit if Stillman honored the covenant not to compete through January 6, 1978. This argument is unpersuasive.

The fact Gorman was seeking more than it had bargained for does not excuse the fact that Stillman delivered less than he had promised. Certainly it did not work an estoppel. In order for an estoppel to arise, it must be shown that "a party's conduct misleads another to believe that a right will not be enforced and causes him to act to his detriment in reliance upon this belief." *Saverslak, supra,* 606 F.2d at 213. Here, Gorman never gave any indication that it intended to refrain from enforcing its rights under the contract. Indeed, far from relying on a representation of this sort, Stillman's conduct was undertaken in defiance of a representation to the contrary.

For all of the above reasons, defendants' motion to amend the memorandum opinion is granted with reference to the error on page 105 and otherwise denied.

### V. *Summary.*

The court disposes of the currently pending motions as follows: Defendants' motion for a new trial is denied. Plaintiff's motion to strike affirmative defenses is granted. Plaintiff's motion to strike deposition testimony is granted. Plaintiff's motion to amend the memorandum opinion and order is denied. Defendants' motion to amend the memorandum opinion is denied, except with respect to the error on page 105.